UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| JEFFREY SCOTT HORNOFF,<br><br>Plaintiff<br><br>v.<br><br>THE CITY OF WARWICK, RHODE ISLAND; RICHARD SANTOS and THOMAS NYE, members of the Warwick Police Department, in their individual capacities; and JOHN AND JANE DOES 1-10, members of the Warwick Police Department, in their individual and supervisory capacities; THE STATE OF RHODE ISLAND; RICHARD HURST and THOMAS DENNISTON, members of the Rhode Island State Police, in their individual capacities; and JOHN AND JANE DOES 11-20, members of the Rhode Island State Police, in their individual and supervisory capacities,<br><br>Defendants. | ) | CA 05 446<br>Civil Action No. __________ |

**COMPLAINT AND JURY DEMAND**

Jeffrey Scott Hornoff ("Hornoff"), by his attorneys, sets forth the following allegations on personal knowledge as to himself and otherwise on information and belief in support of his Complaint:

**INTRODUCTION**

1. In 1983, after finishing second in his class at the police academy, Hornoff became a police officer in order to serve and protect the people of Warwick, Rhode Island. From 1989 through 1996, Hornoff was investigated and prosecuted by the Warwick Police Department, the Rhode Island State Police and the Rhode Island Attorney General's Office for the 1989 murder of Victoria Cushman ("Cushman"). On June 19, 1996, Hornoff was convicted of a murder he

did not commit. At his sentencing, Hornoff stated: "We have faith, still, in our judicial system, and know things will be made right. It's just going to take a little longer than we thought."

2. Hornoff's arrest, trial, wrongful conviction, and six-plus year incarceration were the result of documented and gross failures on the part of certain members of the Warwick Police Department and Rhode Island State Police. Warwick's handling of the investigation into Victoria Cushman's homicide was so delinquent that an independent investigation was launched to review the Warwick Police Department's conduct. The independent investigation resulted in a scathing report issued by independent counsel Kevin J. Bristow on May 2, 1995, which described the Warwick Police Department's conduct as "inexplicable," "deficient," and "severely flawed," and observed that Warwick officers failed to gather evidence "crucial in either implicating or clearing Detective Hornoff."

3. In or about 1991, due to the documented ineptitude of the Warwick Police Department, the State Police were asked to assist in investigating the 1989 Cushman murder. The State Police worked with "liaison" police officers from Warwick and, together, they began building a false case against Hornoff.

4. As set forth more fully below, only by knowingly or recklessly destroying, suppressing, and ignoring key pieces of evidence, intimidating and coercing witnesses, offering false evidence, using improper investigatory techniques, and committing other misdeeds, were the State of Rhode Island, the City of Warwick, and various individuals able to convince a jury that Hornoff was guilty of a murder he did not commit.

5. As a result of his wrongful conviction, Hornoff lost <u>everything</u>: his home, his profession, his family, and his freedom.

6. Beyond compensating Hornoff for the six plus years of his life that were wrongly taken from him and for his continuing injuries, this lawsuit seeks to redress the unlawful municipal policies and practices that led to the violation of a Rhode Island and United States citizen's clearly established rights as guaranteed by the United States Constitution and its Amendments.

## JURISDICTION

7. Title 28 U.S.C. § 1331 provides federal question jurisdiction, and 28 U.S.C. § 1367 provides supplemental jurisdiction over the state law claims.

## VENUE

8. Pursuant to 28 U.S.C. § 1391(b), venue is proper in the District of Rhode Island, the judicial district in which the claim arose and in which all Defendants reside and/or conduct business.

## PARTIES

9. Plaintiff Jeffrey Scott Hornoff was at all times relevant to this action an individual residing in Rhode Island.

10. Defendant City of Warwick is a duly organized municipal corporation under the laws of the State of Rhode Island. At all times relevant to this action, the Warwick Police Department was a department within the City of Warwick.

11. Defendant Richard Santos, at all times relevant to this action, was a member of the Warwick Police Department. His actions and omissions alleged in this Complaint were taken under color of the laws of the State of Rhode Island. He is sued in his individual capacity.

12. Defendant Thomas Nye, at all times relevant to this action, was a member of the Warwick Police Department. His actions and omissions alleged in this Complaint were taken under color of the laws of the State of Rhode Island. He is sued in his individual capacity.

13. Defendants John and Jane Doe 1-10, whose identities are currently unknown, were employees of the Warwick Police Department, including those with supervisory authority over Defendants Santos and Nye at times relevant to this action, whose actions and omissions alleged in this Complaint were taken under color of the laws of the State of Rhode Island. They are sued in their individual and supervisory capacities.

14. Defendant State of Rhode Island is a governmental entity, employing certain Defendants who purported to act on its behalf. At all times relevant to this action, the Rhode Island State Police was a government entity within the State of Rhode Island.

15. Defendant Richard Hurst, at all times relevant to this action, was a member of the Rhode Island State Police. His actions and omissions alleged in this Complaint were taken under color of the laws of the State of Rhode Island. He is sued in his individual capacity.

16. Defendant Thomas Denniston, at all times relevant to this action, was a member of the Rhode Island State Police. His actions and omissions alleged in this Complaint were taken under color of the laws of the State of Rhode Island. He is sued in his individual capacity.

17. Defendants John and Jane Doe 11-20, whose identities are currently unknown, were employees of the Rhode Island State Police, including those with supervisory authority over Defendants Hurst and Denniston at times relevant to this action, whose actions and omissions alleged in this Complaint were taken under color of the laws of the State of Rhode Island. They are sued in their individual and supervisory capacities.

18. At all times relevant to this action, in committing the acts and omissions alleged, each of the Defendants was acting under color of law.

## FACTS

### SCOTT HORNOFF AND THE WARWICK POLICE DEPARTMENT

19. In 1983, Scott Hornoff graduated second in his class from the Rhode Island Municipal Police Training Academy.

20. As with all new officers, Hornoff joined the Warwick Police Department as a probationary patrolman. He became a permanent member of the Department in 1984. From 1983 to 1984, Hornoff worked in the undercover drug unit, where he was credited with numerous arrests for possession, distribution and other drug-related offenses.

21. Beginning in 1984, Hornoff served as a uniformed patrolman. He was promoted to Detective in 1989.

22. On or about November 26, 1989, Hornoff fell and injured his back while on duty. He was diagnosed with disc herniation and underwent surgery in 1990 to have a disc removed.

23. Hornoff's older brother, John David Hornoff, also served on the Warwick Police Department.

### THE NIGHT OF VICTORIA CUSHMAN'S MURDER

24. On the night of August 10, 1989, Scott Hornoff attended a party hosted by a Warwick police officer. Many of Hornoff's fellow police officers, and their spouses, also attended the party.

25. Hornoff left the party and went home, but returned to the party later.

26. The same night, Todd Barry went out to a bar.

27. Barry had a prior relationship with Victoria Cushman that spanned several months. Barry's contact information was in Cushman's file of addresses, found inside her apartment.

28. On the night of August 10, 1989, Barry went to Cushman's apartment building and made his way into her apartment by stepping in the flowerbed below her second-floor window, then climbing up the side of the house with the help of a drain pipe and porch railing. He entered her apartment through a window above the front porch.

29. Barry left footprints in the flowerbed and muddy scuff marks on the side of the house.

30. Barry knew the premises because he had been there before.

31. According to Barry, once inside he proceeded to argue and then struggle with Cushman, striking her with various objects, and eventually killing her.

32. Before he struck the final blow, Barry donned a pair of yellow latex dishwashing gloves.

33. Retreating from the scene of the crime, Barry left behind the latex gloves he had worn during the murder. Biological evidence was later identified on the interior of the latex gloves, including blood stains, hair and fiber.

34. A stained gauze pad that lay next to the latex gloves Barry had discarded was also identified at the crime scene.

**WARWICK'S BOTCHED INVESTIGATION**

35. On the morning of August 11, 1989, members of the Warwick Police Department attempted to collect evidence from the Cushman crime scene.

36. Defendants Santos and Nye were assigned to investigate the Cushman murder.

37. Defendant Santos was in charge of the Major Crimes Unit at the time of the Cushman murder. Santos and Nye reported to Captain Ronald Carter until he retired in October 1989.

**Warwick's Mishandling of the Crime Scene**

38. The independent counsel hired to investigate the failures of the Warwick Police Department's work on the Cushman murder concluded: "[s]everal aspects of the crime scene investigation conducted by the Warwick Police Department on August 11, 1989, at Victoria Cushman's apartment were deficient."

39. Cushman's murderer, Todd Barry, claims he was in an alcohol- and drug-induced, deranged state the night of August 10, 1989. Whatever his state of mind that evening, Barry left numerous pieces of evidence at Cushman's apartment linking him to the crime.

40. In the early morning of August 11, 1989, officer John Oscarson of the Warwick Police Department arrived at Cushman's apartment. Sergeant William McDonald arrived shortly thereafter. As the lead Bureau of Criminal Investigation officer, McDonald was responsible for ensuring that the crime scene was handled properly.

41. Oscarson attempted to secure the crime scene by sealing the entry way and allowing only Warwick's homicide detectives to enter Cushman's apartment. The patrol supervisor disregarded Oscarson's efforts to protect the crime scene until the homicide investigators arrived. Instead, the patrol supervisor entered the premises, and allowed the assistant medical examiners and at least one other police officer to enter Cushman's apartment before the homicide investigators arrived.

42. At some point early that morning, a Warwick officer removed Cushman's bedroom window screen, creating confusion as to the perpetrator's point of entry.

43. Also that morning, one or more Warwick officers trampled the flowerbed where Todd Barry had left his footprints, thereby rendering Barry's footprints of no investigative value.

44. The Warwick police also failed to examine or otherwise preserve blood stains inside one of the dishwashing gloves Barry wore and left at the crime scene.

45. At some point, hair and fiber found on the dishwashing gloves was sent for forensic testing. However, this evidence was eventually lost or destroyed before it could be subjected to DNA or other forensic testing.

46. The existence of such evidence was <u>not</u> <u>disclosed</u> to Hornoff's defense attorney prior to trial. Records relating to the hair and fiber became known to Hornoff years <u>after</u> his trial.

47. The Warwick investigators also lost or destroyed the stained gauze pad left at the crime scene. The gauze pad, which could have provided crucial DNA or other biological evidence, appears in crime scene photographs, lying between the latex gloves worn by Barry. Under control of the Warwick Police Department, this key piece of evidence disappeared.

48. In addition, the Warwick Police never sent Cushman's bathrobe, which she was wearing at the time of the murder, to a laboratory for forensic analysis.

49. Nor did the Warwick Police analyze latent finger prints found at the crime scene. As noted in the Bristow Report, "[t]he failure to compare these prints to those of a victim killed in her own residence is inexplicable."

50. Based on Barry's own description of his actions in the apartment on the night of the murder, which indicates the presence of fingerprint evidence left by Barry in Cushman's apartment, Warwick's failure to identify and preserve Barry's fingerprints is equally "inexplicable."

51. Like other key evidence in this matter, prior to trial, Hornoff's defense counsel was informed that the Computer Aided Dispatch records for all Warwick police cars during the 24-hour period surrounding Cushman's murder were "missing," and unavailable for inspection.

52. Subsequent to Barry's confession and arrest, Warwick Police Officers disclosed that Barry's name and phone number was found in Cushman's file of addresses, which had been in the possession of the Warwick Police as early as the morning of August 11, 1989. Yet Barry was never contacted by the Warwick or State Police investigators.

**Warwick's Mishandling of Hornoff as a Suspect**

53. One item in Cushman's apartment that did capture the attention of the Warwick investigators was a sealed envelope labeled "Scott Hornoff," which contained a letter Cushman had written, but not sent, to Hornoff.

54. On August 11, 1989, Hornoff arrived at the Warwick Police Station for his 4:00 p.m. shift.

55. Within minutes after his arrival, Captain Ronald Carter and Lieutenant Edward Johnson interviewed Hornoff as part of the Warwick Police Department's investigation of Cushman's murder.

56. The interview, lasting approximately 15 minutes, was tape recorded. Among other things during this interview, Hornoff truthfully told Carter and Johnson he had nothing to do with Cushman's murder.

57. The Warwick Police destroyed, lost or intentionally kept hidden the tape recording of the Hornoff interview.

58. A written report memorializing the initial interview of Hornoff was also destroyed, lost or hidden.

59. Carter and Johnson gave conflicting accounts of the initial Hornoff interview. As Bristow observed in his report, "[i]t is very significant that Edward Johnson and Ronald Carter have drastically different recollections of what occurred during the interview of Detective Hornoff."

60. Hornoff's defense at trial would have been aided had he been given access to the recorded statement he voluntarily provided less than 24 hours after Cushman's murder.

61. Immediately after the August 11th interview, Hornoff agreed to participate in a polygraph examination, which he passed.

62. In the hours and days after he became a prime suspect, the Warwick investigators failed to secure evidence from Hornoff's home, his car or any of his belongings. Such evidence would have been susceptible to forensic analysis that would have supported Hornoff's claim of innocence.

63. At least one Warwick officer, Commander John G. Glendenning, Jr., specifically recommended that the Department follow protocol concerning Hornoff, and therefore suggested that Hornoff's car and clothing be seized for inspection and analysis.

64. Glendenning's suggestion was rebuffed by supervisors. Again, had proper procedures been followed, exculpatory evidence – such as the absence of Ms. Cushman's blood in Hornoff's car, or on his shoes or clothes – would have come to light that would have helped avoid Hornoff's wrongful conviction.

65. The Warwick Police also altogether failed to interview obvious material witnesses. According to the independent investigator hired to review Warwick Police's failures in connection with the Cushman investigation, "it is inexplicable that Sergeant John David Hornoff was not spoken to regarding his knowledge of his brother's whereabouts on the night of

August 10th in the more than two years that the Warwick Police Department had exclusive control of the investigation."

66. Equally inexplicable was the failure of the Warwick Police to interview the numerous officers who attended the patrolman's party on the night of August 10, 1989. These individuals were not interviewed regarding Hornoff's presence at the party until the State Police took over the investigation more than two years later. The Bristow Report emphasized the gravity of the Warwick Police Department's failure to interview these obviously material witnesses:

> It cannot be overstated that many of the people at that party were police officers who were reporting for work while Carter was interviewing Detective Hornoff on the afternoon of August 11th. These officers would be crucial in either implicating or clearing Detective Hornoff and they were not spoken to even though they were under the direct control of the Warwick Police Department. [Emphasis Added.]

67. The Bristow Report concluded that the Warwick Police Department's failures were systemic, and ran right to the top of the department: "[r]esponsibility for these failures lies with former Chief of Police Wesley Blanchard and the individuals he placed in positions of authority. Chief Blanchard bears responsibility because as the Chief of Police he was in charge and was accountable for what occurred under his command."

68. At least one of the witnesses who the Warwick investigators interviewed shortly after Cushman's murder provided exculpatory evidence that was omitted from police reports, and at least one police report contained false information that undermined Hornoff's claim of innocence.

69. Blanchard, together with Defendants Santos and Nye and others, carried out the Warwick Police Department's custom and policy of lax investigative techniques that permitted or encouraged key evidence to be withheld, destroyed or lost, and that prevented discovery and

disclosure of exculpatory evidence that would have come to light had the Warwick police followed proper investigative procedures with respect to Hornoff as a suspect.

70. After taking and passing the polygraph test, Hornoff was advised he was not a suspect. However, certain officers within the Warwick Police Department continued to pursue Hornoff as the lead suspect, and these officers, including Defendants Santos and Nye, worked very hard to see that Hornoff be charged and convicted for Cushman's murder.

**Todd Barry Escapes Notice**

71. Todd Barry was easy to find. He had dated Cushman. Cushman's friends knew him. His name was in her address file. Yet the Warwick investigators never contacted him. They never questioned him. He left evidence all over the crime scene, and Cushman's blood was all over his clothes.

72. In his written confession, even Todd Barry expressed surprise that the Warwick Police did not call to question him: "I always thought I was going to be questioned immediatel[y] after her death. That never happened."

73. Similarly, the owner of a club that Cushman and Barry used to visit together wondered why the police never came to question him.

74. While Barry awaited questioning that never came, Defendants Santos and Nye continued to pursue Hornoff, and they did whatever they could to keep the investigation focused on him.

75. According to former Warwick Police officers, Santos, Nye and certain other individuals within the Warwick Police Department quietly worked to keep the investigation of Hornoff alive.

76. In fact, in or about October 1991, Santos and Nye succeeded in securing the involvement of the Rhode Island State Police in the Cushman investigation. Working in conjunction with Santos, Nye and the Warwick Police Department, the Rhode Island State Police infused new vigor into the inept and misguided investigation of Hornoff that had begun two years earlier.

**THE RHODE ISLAND STATE POLICE JOIN THE INVESTIGATION**

77. In October 1991 the Rhode Island State Police joined in the investigation of the Cushman murder.

78. Defendants Santos and Nye were appointed by the Warwick Police as liaisons to the State Police, and were involved in and assisted with the state-led investigation.

79. The State Police assigned Defendants Hurst and Denniston to lead the investigation for the State.

80. As an initial matter, it appears that the Warwick and State Police mishandled the process of sharing information with one another. For example, three years after the State became involved in the Cushman investigation, a Warwick officer reported that he found at the Warwick Police Department original documents from the Cushman homicide investigation that had apparently not been shared with the State Police, and was sitting in a box that was designated "to be shredded."

81. From the very outset, the State Police led a single-focused investigation.

82. The single-focused nature of the State-led investigation went beyond ignoring evidence and failing to follow proper leads. The conduct of the state investigators and Warwick liaisons revealed that they lacked impartiality, and were willing to take active steps to see Hornoff convicted. Specifically, on at least one occasion one defendant state investigator told an

important witnesses, a former Warwick police officer, that he should "try to hurt Scott a bit" with his testimony. On at least one other occasion, state police investigators intimidated, coerced and threatened a witness who had information that could have potentially derailed defendants' pursuit of Hornoff.

83. One former Warwick police officer reports being so disgusted with defendants' investigation tactics that he took his police uniform out to his backyard and set it on fire.

84. Like the Warwick Police, and with the help of the Warwick police liaisons, the State Police ignored the possibility that Hornoff was innocent, and instead failed to conduct a proper investigation, which would have led them, for example, to contact key witnesses listed in Cushman's address file, including the perpetrator himself.

85. Instead of working together to find Todd Barry – Cushman's killer – the state investigators, including Defendants Hurst and Denniston, threatened Warwick police officers who had done nothing more than approach Hurst and Denniston with information relevant to their investigation. The state investigators did not want to know anything unless it pointed to Hornoff as the one and only suspect.

86. The refusal to work together in an effort to solve the Cushman murder resulted in many lost opportunities to bring Todd Barry to justice – something that would, necessarily, have prevented Hornoff's wrongful conviction.

87. A critical aspect of the government's case at Hornoff's trial was establishing the existence of blood on the screen in Cushman's bedroom window. The government's theory was that Hornoff had entered Cushman's house through the front door, murdered her, and then opened the window to make it look like a break-in. The blood on the screen provided evidence

to support this theory. Prosecutor Randall White emphasized the existence of blood on the interior of the window screen throughout the trial.

88. Post-conviction testing of the window screen has revealed that there was no blood at all, contrary to the testimony of the prosecution's expert. The absence of blood completely undermines the prosecution's theory of events that were presented as true in court, but in fact never happened at all.

89. Like the Warwick Police, the State Police failed to see to it that key evidence was preserved, or, at least, the destruction of such evidence was disclosed to Hornoff's defense counsel. For example, while it may be unclear when exactly the hair and fiber from the murderer's latex gloves disappeared or was destroyed, its existence in the first instance was never disclosed to Hornoff's defense counsel.

**HORNOFF'S WRONGFUL PROSECUTION AND CONVICTION**

90. On December 27, 1994, Hornoff was indicted and charged with the murder of Victoria Cushman. The Warwick Police Department suspended Hornoff without pay on or about December 29, 1994.

91. The investigation had taken a personal and financial toll on Hornoff and his family. Hornoff had been branded a murderer, causing long-time friends to cease associating with him. He and his friends were harassed by Defendants, who were dead-set on securing a conviction against him. He was forced to spend huge sums in legal fees, which, eventually, caused his mother to sell her house in order help cover legal expenses.

92. While he awaited his trial, after his suspension, Hornoff applied for a job with more than three dozen potential employers only to be turned down by every one of them. The

stigma attached to Hornoff during this period caused him not only lost employment opportunities, but severe mental anguish as well.

93. During this period, Hornoff was diagnosed with situational depression. He was prescribed antidepressants.

94. At trial, the primary evidence presented against Hornoff was circumstantial: he wanted to kill Cushman because he feared she would expose the existence of a relationship between them; he had disappeared from and returned to a party; there was blood on the window as evidence that he came in the front door, killed her, and tried to make it look like a break-in. The prosecution argued that a police officer such as Hornoff was uniquely able to stage a crime scene.

95. This theory relied heavily on the false evidence of blood on the window screen.

96. In addition, due to all of the lost and/or destroyed evidence, with significant exculpatory value, Hornoff was deprived of his ability to fairly defend himself.

97. On June 19, 1996, Hornoff was wrongfully convicted of murder. On July 10, 1996, he was sentenced to life in prison.

98. While Hornoff went to prison, Defendants Hurst and Denniston each were granted promotions.

**<u>HORNOFF'S LIFE IN PRISON</u>**

99. Hornoff was wrongfully sentenced to life in prison.

100. He lived in a prison cell for six years, four months, and eighteen days.

101. In prison, because he had been a police officer, Hornoff was held in protective custody.

102. Hornoff was deprived of the ability to spend time with his three young sons.

103. On multiple occasions, however, Hornoff shared a cell with violent sex offenders.

104. Hornoff was forced to endure strip searches and at times was held in isolation without any clothing.

105. Hornoff's direct appeals to the Rhode Island Supreme Court were denied on October 24, 2000. His employment as a police officer for the City of Warwick was terminated on October 26, 2000, and his and his family's health and dental insurance coverage provided through the City of Warwick was terminated as of October 31, 2000.

**HORNOFF'S CONTINUED FIGHT TO PROVE HIS INNOCENCE**

106. From the day he was first questioned, Hornoff truthfully maintained that he had nothing to do with the Cushman murder.

107. After his motion for new trial and his direct appeals were denied, Hornoff sought habeas relief and pursued other avenues to prove his innocence and win his freedom.

108. In 2002, after several requests by Hornoff, the Court allowed him to pursue DNA testing in order to prove his innocence.

109. Before DNA testing was completed, Cushman's murderer came forward on his own.

**HORNOFF'S EXONERATION**

110. On November 1, 2002, William J. Ferland, Rhode Island Assistant Attorney General, received an affidavit from Todd Barry in which Barry admitted that he murdered Victoria Cushman.

111. On or about November 3, 2002, Barry gave a three-hour videotaped confession, in which he described how he had scaled the side of Cushman's house, entered through the bedroom window, donned the rubber gloves, and murdered her.

112. On November 6, 2002, Hornoff was released from prison, pending a ruling on his Amended Application For Post-Conviction Relief.

113. On January 6, 2003, Barry pled guilty to the August 1989 murder of Victoria Cushman. The same day, the Rhode Island Superior Court granted Hornoff's Amended Application For Post-Conviction Relief, vacated his conviction, and, "in the interest of justice," dismissed the indictment and charges against him with prejudice, on the grounds of actual innocence.

114. On June 6, 2003, the Rhode Island Superior Court issued an Order officially expunging Hornoff's conviction from the public record.

115. Had Todd Barry not come forward, Hornoff might have spent the rest of his life an innocent man in a prison cell – as a direct result of the inexcusable acts and omissions of the Defendants in this case.

**THE CITY OF WARWICK'S INDIFFERENCE**
**AND ACQUIESCENCE TO POLICE MISCONDUCT**

116. At the time of Hornoff's arrest, the Warwick Police Department did not have a properly functioning system of internal investigation. The Warwick Police Department's conduct was deemed so inappropriate that independent counsel was retained to investigate the handling of the Cushman investigation. The Bristow Report described wide-ranging problems with the so-called investigation that Warwick conducted of one of its own officers.

117. The Warwick Police Department failed to hold its officers to an ethical standard. This created an environment in which officers like Defendants Santos and Nye felt free to ignore or destroy evidence when they knew such conduct would result in the prosecution and punishment of Hornoff.

118. The Warwick Police Department failed to train and supervise adequately its employees as to: (a) the collection, inventory, and safeguarding of evidence; and (b) the proper handling of an investigation into one of its own officers' alleged conduct.

119. Warwick policymakers were aware of a pattern of mishandling of evidence and inadequate investigation of the Police Department's own officers – a pattern that appeared within the Hornoff investigation itself. The Warwick policymakers nevertheless failed to institute appropriate training, supervision, or discipline to remedy these patterns of mishandling exculpatory or potentially exculpatory evidence and inadequately investigating its own officers. Hornoff suffered grievous injury as a result.

120. The officers responsible for the misconduct identified in the Bristow Report were never disciplined.

121. The recommendations in the Bristow Report demonstrate that the Warwick Police Department's conduct in the Cushman investigation totally contravened appropriate policy. Bristow concluded:

> it is possible to make recommendations regarding changes which could be implemented to prevent the Warwick Police Department from repeating the mistakes made during its investigation of Victoria Cushman's homicide. The major issue involves whether this type of matter should be investigated by members of a suspect's own police department. . . .
>
> The Warwick Police Department should create a policy of immediately notifying and regularly consulting with the Attorney General if they make a future determination to retain control of a criminal investigation of one of their own members. In addition, there has to be a determination made that if they are going to keep such an investigation, then the member of their department under suspicion has to be treated like a suspect and not like a police officer. This treatment has to be comprehensive and should include everything from what questions they are asked in an interview to what happens to the reports and documents which result from that interview.

**HORNOFF'S DAMAGES**

122. As a direct result of the Defendants' unconstitutional actions, Hornoff sustained the following injuries and damages: personal injuries; pain and suffering; severe mental anguish; emotional distress; loss of income; infliction of physical illness; inadequate medical care; loss of health insurance; humiliation, indignities and embarrassment; degradation; injury to reputation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom, such as diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression.

123. To this day, Hornoff suffers from emotional disorders, including post-traumatic stress disorder, as well as physical problems, caused and/or exacerbated by more than six years in prison. He also has suffered significant economic loss.

124. In addition to severe back and hip pain, Hornoff has suffered and continues to suffer from the following symptoms: insomnia, nightmares, night tremors (kicking and punching), night sweats, migraine headaches followed by uncontrollable itching and more migraines, irritability, depression, lack of motivation and attention to detail, claustrophobia, paranoia, weight gain, and memory loss.

125. The Defendants' unlawful, intentional, willful, purposeful, deliberately indifferent, reckless, bad-faith, and/or malicious acts, misdeeds, and omissions caused Hornoff to be falsely arrested, maliciously prosecuted, unfairly tried, wrongfully convicted, and wrongfully imprisoned for more than six years, together with all of the other injuries and damages set forth above.

126. The alleged acts, misdeeds, and omissions committed by the individual Defendants described herein for which liability is claimed were done intentionally, willfully, purposefully, knowingly, unlawfully, maliciously, wantonly, recklessly, or with bad faith. The proscribed conduct of the individual Defendants meets all of the standards for imposition of punitive damages.

## NOTICE OF CLAIM

127. On or about August 11, 2003, pursuant to R.I. Gen. Laws § 45-15-5, Hornoff notified the City of Warwick of his claims asserted in this action. Since providing notice, the City of Warwick has not made any offer of settlement.

## CAUSES OF ACTION

### Count I—42 U.S.C. § 1983
### Due Process Claims against Defendants Santos, Nye and Doe 1-10 for Spoliation and/or Suppression of Evidence and Failure to Investigate

128. Hornoff repeats and realleges the allegations of Paragraphs 1 through 127 of his Complaint as if fully set forth herein.

**A. Spoliation and/or Suppression of Material Exculpatory Evidence**

129. Defendants Santos, Nye, and Doe 1-10, municipal actors acting under color of law, failed to preserve and/or disclose material information that would have exculpated Hornoff.

130. Acting with deliberate indifference by destroying or otherwise withholding material exculpatory and impeachment evidence prior to trial, these Defendants violated Hornoff's clearly established Fourteenth Amendment right to due process of law as interpreted by the United States Supreme Court in Brady v. Maryland and its progeny.

131. As a direct and proximate cause of these Defendants' conduct, acts, and omissions, and consequent violation of Hornoff's constitutional rights, Hornoff was wrongfully convicted and suffered substantial damages in an amount to be determined at trial.

**B. Failure to Investigate**

132. Defendants Santos, Nye, and Doe 1-10 deliberately and recklessly failed to investigate adequately the crime scene, the murder, and Hornoff, as any minimally competent officer would have done.

133. As a direct and proximate result of Defendants Santos, Nye and others' egregious failure to investigate, in violation of Hornoff's clearly established Fourteenth Amendment rights, Hornoff was wrongfully convicted, and suffered substantial damages in an amount to be determined at trial.

**Count II—42 U.S.C. § 1983**
**Supervisory Liability Claims against Doe Defendants 1-10,**
**Supervisors in the Warwick Police Department**

134. Hornoff repeats and realleges the allegations of Paragraphs 1 through 133 of his Complaint as if fully set forth herein.

135. Unnamed Defendant supervisors in the Warwick Police Department, collectively referred to here as John and Jane Does 1-10, acting under color of law with deliberate indifference to the rights of criminal suspects, failed to train and supervise adequately Defendants Santos and Nye, as well as other Warwick police officers. In so doing, these Defendants encouraged, condoned, or tacitly acquiesced in unconstitutional misconduct, including without limitation the suppression of exculpatory material evidence from the defense and the egregious failure to investigate.

136. The failure of these Defendants to supervise and train the named individual Defendants amounted to deliberate indifference, or intentional misconduct, which proximately and directly caused Hornoff to be wrongfully convicted and to suffer substantial damages in an amount to be determined at trial.

**Count III—42 U.S.C. § 1983**
***Monell* Claims against the City of Warwick**

137. Hornoff repeats and realleges the allegations of Paragraphs 1 through 136 of his Complaint as if fully set forth herein.

138. The Defendant City of Warwick, by and through its policymakers, created and maintained a policy, custom, or practice of failing to properly supervise, train, and discipline Warwick police officers including the individuals named in this case. The City failed to ensure that its police officers would conduct constitutionally adequate investigations, collect, inventory and safeguard evidence in accordance with proper procedure, follow protocols in investigating members of their own department, and follow the duties imposed by Brady v. Maryland relating to the disclosure of material information favorable to criminal defendants.

139. The Warwick Police Department did not have a properly functioning system of internal investigation. This failing was so egregious that an independent counsel was appointed by the State of Rhode Island to investigate the handling of the Cushman investigation.

140. Although the independent counsel's report identified wide-ranging problems with the so-called investigation that Warwick conducted of one of its own officers, no Warwick police officers were disciplined as a result of the report.

141. The Warwick Police Department failed to train and supervise adequately its employees as to the proper handling of exculpatory evidence, as demonstrated by the gross misconduct of Warwick police officers in the investigation of Victoria Cushman's murder.

142. The policies, customs, and practices of the Warwick Police Department described in this Complaint were the moving force behind Hornoff's arrest, prosecution, and incarceration.

143. These policies, customs, and practices maintained by the Warwick Police Department led Warwick police officers to believe that misconduct would be tolerated rather

than disciplined. They made it foreseeable that officers would violate people's constitutional rights.

144. The City of Warwick's failure to train and supervise Warwick police adequately in regard to constitutional duties directly and proximately caused Hornoff's constitutional deprivations, including his malicious prosecution, unfair trial, wrongful conviction, and other grievous and permanent injuries and damages in an amount to be determined at trial.

**Count IV—42 U.S.C. § 1983**
**Due Process Claims against Defendants Hurst, Denniston and Doe 11-20 for Spoliation and/or Suppression of Evidence Intimidation/Coercion of Witnesses, and Failure to Investigate**

145. Hornoff repeats and realleges the allegations of Paragraphs 1 through 144 of his Complaint as if fully set forth herein.

**A. Spoliation and/or Suppression of Material Exculpatory Evidence**

146. Defendants Hurst, Denniston and Doe 11-20, state actors acting under color of law, failed to preserve and/or disclose material information that would have exculpated Hornoff.

147. Acting with deliberate indifference by destroying or otherwise withholding this material exculpatory and impeachment evidence prior to trial, Defendants violated Hornoff's clearly established Fourteenth Amendment right to due process of law as interpreted by the United States Supreme Court in Brady v. Maryland and its progeny.

148. As a direct and proximate cause of these Defendants' conduct, acts, and omissions, and consequent violation of Hornoff's constitutional rights, Hornoff was wrongfully convicted and suffered substantial damages in an amount to be determined at trial.

**B. Intimidation/Coercion of Witnesses**

149. Defendants Hurst, Denniston and Doe 11-20 intimidated and/or coerced witnesses to provide detrimental testimony against Hornoff.

150. Defendants Hurst, Denniston and Doe 11-20 threatened witnesses in order to keep hidden information about potential suspects that was inconsistent with the State Police's single-focused investigation of Hornoff to the exclusion of all other potential suspects.

151. As a direct and proximate result of these Defendants' intimidation and/or coercion of witnesses, in violation of Hornoff's clearly established Fourteenth Amendment rights, Hornoff was wrongfully convicted, and suffered substantial damages in an amount to be determined at trial.

**C. Failure to Investigate**

152. Defendants Hurst, Denniston and Doe 11-20 deliberately and recklessly failed to investigate adequately the Cushman murder, as any minimally competent officer would have done.

153. As a direct and proximate result of Defendants' egregious failure to investigate, in violation of Hornoff's clearly established Fourteenth Amendment rights, Hornoff was wrongfully convicted, and suffered substantial damages in an amount to be determined at trial.

**Count V—42 U.S.C. § 1983**
**Claims against Defendants Santos, Nye, Doe 1-10,**
**Hurst, Denniston and Doe 11-20 for Malicious Prosecution**

154. Hornoff repeats and realleges the allegations of Paragraphs 1 through 153 of his Complaint as if fully set forth herein.

155. When Hornoff was arrested, the only inculpatory physical evidence against him was the existence of a handwritten note scribed by Cushman.

156. Defendants Hurst, Denniston, and Doe 11-20, acting on behalf of and as agents of the State of Rhode Island, and Defendants Santos, Nye and Doe 1-10, acting as liaisons to the State, commenced or caused to be commenced a criminal prosecution, instituted with malice,

against Hornoff. They used improper and inadequate investigative techniques, and they wrongfully pressured witnesses.

157. The Defendants acted to secure a conviction of Hornoff regardless of the evidence and without investigating leads that pointed to suspects other than Hornoff. They chose to ignore, withhold, and/or misrepresent the evidence that indicated Hornoff's innocence.

158. Only through exploitation of the unlawful acts and omissions was the prosecution able to obtain a guilty verdict against Hornoff, an innocent man.

159. The matter ultimately terminated in Hornoff's favor on January 6, 2003, when his conviction was vacated and the indictment and charges against him were dismissed with prejudice, on the grounds of actual innocence, due to the conclusive confession of the real killer, Todd Barry.

160. The Defendants' conduct violated Hornoff's clearly established rights under the Fourteenth Amendment.

161. As a direct and proximate result of the Defendants' conduct, Hornoff was arrested, prosecuted, forced to endure an unfair trial and wrongful conviction, and wrongly imprisoned for more than six years. He suffered grievous injuries and damages in an amount to be determined at trial.

**Count VI—42 U.S.C. § 1983**
**Supervisory Liability Claims against Doe Defendants 11-20,**
**<u>Supervisors for the Rhode Island State Police</u>**

162. Hornoff repeats and realleges the allegations of Paragraphs 1 through 161 of his Complaint as if fully set forth herein.

163. Unnamed Defendant supervisors in the Rhode Island State Police, collectively referred to here as John and Jane Does 11-20, acting under color of law with deliberate

indifference to the rights of criminal suspects, failed to train and supervise adequately Defendants Hurst and Denniston, as well as other Rhode Island State Police officers. In so doing, these Defendants encouraged, condoned, or tacitly acquiesced in Hurst, Denniston and Doe Defendants 11-20 engaging in unconstitutional misconduct, including without limitation: the fabrication of evidence, the intimidation/coercion of witnesses, the suppression of exculpatory material evidence from the defense, and the egregious failure to investigate.

164. The failure of these Defendants to supervise and train the named individual Defendants amounted to deliberate indifference, or intentional misconduct, which proximately and directly caused Hornoff to be wrongfully convicted and to suffer substantial damages in an amount to be determined at trial.

**Count VII—42 U.S.C. § 1983**
**Claims against Defendants Santos, Nye, Doe 1-10,**
**Hurst, Denniston, and Doe 11-20 for Conspiracy to Violate Constitutional Rights**

165. Hornoff repeats and realleges the allegations of Paragraphs 1 through 164 of his Complaint as if fully set forth herein.

166. Defendants Santos, Nye, and Doe 1-10, Hurst, Denniston, and Doe 11-20 conspired, reached a mutual understanding, and acted in concert to violate Hornoff's civil rights.

167. In furtherance of the conspiracy, these Defendants, acting in concert, undertook the overt acts alleged in this Complaint.

168. Defendant's conspiracy directly and proximately caused the constitutional deprivations suffered by Hornoff, including his malicious prosecution, unfair trial, wrongful conviction, and unlawful confinement, and other substantial injuries and damages in an amount to be determined at trial.

**Count VIII—State Constitution**
**Claims against All Defendants for**
**Violation of Due Process**

169. Hornoff repeats and realleges the allegations of Paragraphs 1 through 168 of his Complaint as if fully set forth herein.

170. By their acts and omissions described in Counts I through VII above, including without limitation their withholding and fabrication of evidence, intimidation/coercion of witnesses, and failure to investigate with competence and impartiality, Defendants deprived Hornoff of the protections of due process of law guaranteed by Article 1, Section 2 of the Rhode Island Constitution.

171. As a direct and proximate result of the Defendants' conduct, Hornoff was arrested, prosecuted, forced to endure an unfair trial and wrongful conviction, and wrongly imprisoned for more than six years. He suffered grievous injuries and damages in an amount to be determined at trial.

**Count IX—State Tort Law**
**Claims against Defendants Santos, Nye, Doe 1-10, Hurst, Denniston,**
**Doe 11-20, and State of Rhode Island for Malicious Prosecution**

172. Hornoff repeats and realleges the allegations of Paragraphs 1 through 171 of his Complaint as if fully set forth herein.

173. When Hornoff was arrested, the only inculpatory physical evidence against him was the existence of a handwritten note scribed by Cushman.

174. Defendants Hurst, Denniston, and Doe 11-20, acting on behalf of and as agents of the State of Rhode Island, and Defendants Santos, Nye and Doe 1-10, acting as liaisons to the State, commenced or caused to be commenced a criminal prosecution, instituted with malice, against Hornoff. They used improper and inadequate investigative techniques, and they wrongfully pressured witnesses.

175. The Defendants acted to secure a conviction of Hornoff regardless of the evidence and without investigating leads that pointed to suspects other than Hornoff. They chose to ignore, withhold, and/or misrepresent the evidence that indicated Hornoff's innocence.

176. Only through exploitation of the unlawful acts and omissions was the prosecution able to obtain a guilty verdict against Hornoff, an innocent man.

177. The matter ultimately terminated in Hornoff's favor on January 6, 2003, when his conviction was vacated and the indictment and charges against him were dismissed with prejudice, on the grounds of actual innocence, due to the conclusive confession of the real killer, Todd Barry.

178. As a direct and proximate result of the Defendants' conduct, Hornoff was arrested, prosecuted, forced to endure an unfair trial and wrongful conviction, and wrongly imprisoned for more than six years. He suffered grievous injuries and damages in an amount to be determined at trial.

**Count X—State Tort Law**
**Claims against All Defendants for**
**<u>Intentional Infliction of Emotional Distress</u>**

179. Hornoff repeats and realleges the allegations of Paragraphs 1 through 178 of his Complaint as if fully set forth herein.

180. All of the Defendants or their employees, acting intentionally or recklessly, engaged in extreme and outrageous conduct – including without limitation the withholding and fabrication of evidence, intimidation/coercion of witnesses, and failure to investigate with competence and impartiality – that resulted in Hornoff's wrongful arrest, prosecution, conviction, and imprisonment.

181. As a direct and proximate cause of the Defendants' extreme and outrageous conduct, undertaken intentionally or recklessly, Hornoff has suffered and continues to suffer severe emotional distress, including depression, post-traumatic stress disorder, and other mental and physical injuries and damages in an amount to be determined at trial.

182. A reasonable person in Hornoff's situation, having suffered wrongful conviction, would have experienced severe emotional distress, as Hornoff has.

**Count XI—State Tort Law**
**Claims against All Defendants for**
**Negligent Infliction of Emotional Distress**

183. Hornoff repeats and realleges the allegations of Paragraphs 1 through 182 of his Complaint as if fully set forth herein.

184. All of the Defendants or their employees, acting negligently, engaged in extreme and outrageous conduct – including without limitation the withholding and fabrication of evidence, intimidation/coercion of witnesses, and failure to investigate with competence and impartiality – that resulted in Hornoff's wrongful arrest, prosecution, conviction, and imprisonment.

185. As a direct and proximate cause of the Defendants' negligent conduct, Hornoff has suffered and continues to suffer severe emotional distress, including depression, post-traumatic stress disorder, and other mental and physical injuries and damages in an amount to be determined at trial.

186. A reasonable person in Hornoff's situation, having suffered wrongful conviction, would have experienced severe emotional distress, as Hornoff has.

**Count XII—State Tort Law**
**Claims against All Defendants for Negligence**

187. Hornoff repeats and realleges the allegations of Paragraphs 1 through 186 of his Complaint as if fully set forth herein.

188. The Defendants owed Hornoff a duty of care, and breached that duty – through their own misconduct or the misconduct of persons under their supervision and control – by failing to investigate either the Cushman homicide or Hornoff properly.

189. With due care and proper diligence, including, for example, following the leads provided by Cushman's own address file or asking Cushman's friends the most basic questions, the Defendants would have discovered that Hornoff was innocent and that another man had killed Victoria Cushman.

190. Because the individual Defendants were improperly and/or inadequately trained and supervised, they failed to undertake even the most basic fundamentals of police work.

191. As a direct and proximate result of the Defendants' conduct, Hornoff was arrested, prosecuted, forced to endure an unfair trial and wrongful conviction, and wrongly imprisoned for more than six years. He suffered grievous injuries and damages in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Hornoff prays that this Court:

A. Enter judgment in favor of Hornoff and against the Defendants on all Counts of the Complaint;

B. Award compensatory damages to Hornoff and against the Defendants, jointly and severally, in an amount to be determined at trial;

C. Award punitive damages to Hornoff and against the individual Defendants as appropriate, in an amount to be determined at trial, in order that such an award will deter similar proscribed conduct in the future;

D. Award to Hornoff and against the Defendants, jointly and severally, pre-judgment and post-judgment interest on all sums awarded him in this action;

E. Award to Hornoff and against the Defendants, jointly and severally, recovery of his costs concerning this action, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988; and

F. Award Hornoff such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMAND**

PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY ON ALL ISSUES AND CLAIMS SO TRIABLE.

**JEFFREY SCOTT HORNOFF,**

By his attorneys,

William C. Dimitri (R.I. Bar #3129)
462 Broadway
Providence, RI 02909
Telephone: (401) 273-9092
Fax: (401) 331-1898

Robert N. Feldman (*pro hac vice* motion pending)
BIRNBAUM & GODKIN, LLP
280 Summer Street
Boston, MA 02210-1108
Telephone: (617) 307-6100
Fax: (617) 307-6101

Dated: October 21, 2005