# EXHIBIT B

FINAL REPORT TO

THE HONORABLE LINCOLN C. CHAFFEE

# THE CITY OF WARWICK POLICE DEPARTMENT'S INVESTIGATION OF THE VICTORIA CUSHMAN HOMICIDE

By: Kevin J. Bristow, Esq.

May 2, 1995

## Introduction

This is a final report regarding the Warwick Police Department's investigation of the Victoria Cushman homicide. On January 11, 1995, the undersigned was appointed by the Honorable Lincoln D. Chafee to undertake a review of the City of Warwick Police Department. The initial focus of this assignment involved conducting a thorough review of the Warwick Police Department's investigation of the the August 11, 1989, killing of Victoria Cushman. A member of the Warwick Police Department, Detective Jeffrey Scott Hornoff, has been indicted for murder and is awaiting trial in connection with Ms. Cushman's death.

It is important to note from the outset that this final report regarding the Victoria Cushman homicide investigation is not intended to conduct an investigation into the death of Ms. Cushman or to evaluate the evidence in the case pending against Detective Hornoff. In addition, there are other matters which are unrelated to the Cushman homicide which are being assessed as part of my review of the conduct of the Warwick

Police Department. The review of these other matters is in progress and will not be mentioned in this report. Reports regarding these other matters will be prepared, where appropriate, upon completion of my assessment of the facts surrounding those matters.

This final report will begin with a brief recitation of the facts surrounding the killing of Victoria Cushman and the relevant chronological events of the resulting homicide investigation. Next, a detailed review of the actions of the Warwick Police Department will be provided. Finally, findings will be made and recommendations will be offered regarding the handling of this and any future similar matter by the Warwick police.

The information contained in this report was obtained by reviewing the Warwick Police Department's files regarding their investigation of Victoria Cushman's death and by interviewing numerous individuals who were involved with or who had first hand knowledge of that investigation. The Warwick Police Department's investigative files were obtained the day following my appointment. Subsequently, copies were made and the originals were turned over by me to the Rhode Island State Police.

The following is a list of the individuals who were interviewed in connection with my review of the Cushman homicide investigation. Those persons whose name is preceded by a designation of rank are current or former members of the Warwick Police Department unless another police department or law enforcement agency is designated.

1. Detective Paul Ainsworth
2. Former Detective Kenneth Anderson
3. Former Rhode Island State Police Captain Brian Andrews
4. Former Chief of Police Wesley Blanchard

5. Detective Mark Brandreth
6. Former Captain Ronald Carter
7. Public Safety Commissioner Stephen Castiglioni
8. Detective Jeffrey Clements
9. Captain Kevin Collins
10. Detective Thomas P. Conroy, III
11. Mr. Robinson Cushman
12. Chief William DeFeo
13. Rhode Island State Police Sergeant Thomas Denniston
14. Lieutenant Beth Ellinwood
15. Detective James Ellis
16. Former Commander John G. Glendinning, Jr.
17. Rhode Island State Police Lieutenant Richard Hurst
18. Major Edward Johnson
19. Sergeant William McDonald
20. Former Commander Walter McKnight
21. Former Deputy Chief John Mulhearn
22. Captain Thomas Nye
23. Detective Raymond Pendergast
24. Sergeant Edmund F. Pierce
25. Sergeant Richard Santos
26. Assistant Attorney General Randy White

It should be noted that an effort was made to speak with Major Joseph Duquette. Major Duquette has been and is currently medically unable to be interviewed. No past or former member of the Warwick Police Department refused my request to be interviewed in connection with the Cushman homicide investigation.

Attorney Gerald J. Coyne, my law associate, assisted and participated in this review and the preparation of this report.

## Factual Synopsis

On the morning of August 11, 1989, the body of twenty-nine year old Victoria Cushman was found on the living room floor of her residence at 56 Maple Street, Warwick, Rhode Island. Ms. Cushman's body was discovered by a co-worker who had come to her apartment after she failed to appear for work that day. The Warwick police were immediately called and responded within minutes of being notified of the death. A crime scene investigation was conducted which resulted in the discovery of a letter from Ms. Cushman to an active member of the Warwick Police Department, Detective Jeffrey Scott Hornoff. This letter clearly indicated the existence of an intimate relationship between Ms. Cushman and Detective Hornoff. The letter also indicated that Hornoff was attempting to break off the relationship against Ms. Cushman's wishes. Subsequent police interviews with friends and associates of Victoria Cushman confirmed the existence of the relationship.

Ms. Cushman was pronounced dead at the scene and her death was ruled a homicide by the Office of the Rhode Island Medical Examiner. The cause of death was

determined to be craniocerebral trauma. She suffered multiple significant skull fractures from what appeared to be a single impact ~~sight~~ site. It is believed that she was killed very late on the night of August 10, 1989, or early on the morning of August 11th.

The homicide investigation was handled by the Warwick Police Department's Major Crime Unit. Sergeant Richard Santos was in charge of this unit at that time. Sergeant Santos' immediate superior was then Lieutenant Edward Johnson. Captain Ronald Carter was in charge of the entire detective division. On October 14, 1989, Captain Carter retired and, one week later, Captain Joseph Duquette assumed command of the detective division.

The Cushman homicide investigation remained in the control of the Warwick Police Department until October of 1991 when, at the request of the R.I. Department of Attorney General, it was turned over to the Rhode Island State Police. Sergeant Santos and then Lieutenant Thomas Nye were appointed as liaisons by the Warwick police to facilitate the transfer of the investigation to the State Police and to render assistance upon request. Lieutenant Richard Hurst and Sergeant Thomas Denniston were assigned by the State Police to conduct the investigation.

On December 27, 1994, Detective Jeffrey Scott Hornoff was indicted for the murder of Victoria Cushman. Detective Hornoff has pled Not Guilty and is awaiting trial.

## Review of the Conduct of the Warwick Police

The first aspect of this matter which will be discussed is the actions of the police on August 11, 1989, the day the body of Victoria Cushman was discovered.

**This will include reviewing the crime scene investigation, the interview of Jeffrey Scott Hornoff, and the investigation away from the crime scene.**

The Crime Scene Investigation

The investigation of a crime scene, particularly the scene of a violent crime, is one of the most critical aspects of any criminal investigation. Evidence obtained at the crime scene is used to reconstruct the crime, eliminate suspects, and identify the perpetrator(s). Types of evidence obtained at the scene of a violent crime include not only well known forensic evidence such as fingerprints and serological specimens and splatter patterns; but also hair and fiber droppings, foot impressions and scuffing, and body and object placement. Forensic evidence is known as "hard evidence" which, once established, is hard to controvert in a subsequent criminal proceeding. It is also evidence which can be used by law enforcement investigators to confront suspects and induce otherwise unobtainable incriminating statements and confessions.

Several aspects of the crime scene investigation conducted by the Warwick Police Department on August 11, 1989, at Victoria Cushman's apartment were deficient and are deserving of comment. First, the investigation failed to detect blood on a window screen at a window which was initially thought to be the point of entry into the apartment. The importance of this is enhanced by the significance in this case of whether the perpetrator entered the victim's apartment through a window or gained entry through the use of a key and later staged a break-in for the purpose of concealing their identity. The blood was detected after the investigation and physical evidence were turned over to the State Police.

It is also significant that Ms. Cushman's outerwear clothing was retained, but was never sent for forensic evaluation. At the time of her death, the victim was wearing only a

bathrobe. This item of clothing had clear evidentiary value as a potential source of, amongst other things, serological, fiber, and human and pet hair evidence. The item was not sent for forensic evaluation until it came into the possession of the State Police.

Finally, latent palm/fingerprints found at the scene were never compared with that of the victim and therefore not identified as those of the victim until they came into the possession of the State Police. The failure to compare these prints to those of a victim killed in her own residence is inexplicable. The postmortem palm and fingerprints of the victim were in the possession of the Warwick Police and were never compared to those recovered at the crime scene. The significance of this omission relates not only to the time and resources expended comparing suspects' prints to the readily identifiable recovered prints, but also the possibility of eliminating a suspect because their prints do not match those recovered at the crime scene. In addition, the existence of any of the victim's palm/fingerprints at a crime scene can be used in conjunction with other evidence by a criminologist or forensic scientist to reconstruct the crime.

The Interview of Detective J. Scott Hornoff

As noted, the crime scene investigation did recover a letter from the victim to Detective Jeffrey Scott Hornoff. The contents of this letter caused Detective Hornoff to be considered a suspect in Victoria Cushman's homicide. On August 11, 1989, Detective Hornoff reported to work at approximately 3:45 P.M. Upon arriving at work he was directed to wait in an office. Soon thereafter, Detective Hornoff was interviewed by the head of the detective division, Captain Ronald Carter, in the presence of Lieutenant Edward Johnson. Subsequently, Detective Hornoff was administered a polygraph examination by Warwick Sergeant Edmund Pierce at the direction of Captain Carter.

The interview and the polygraph examination of Detective Hornoff are severely flawed. Detective Captain Ronald Carter assumed temporary control of the investigation and interviewed Hornoff. The head of the police department's Major Crime Unit and the man who would ultimately be responsible for the investigation, Sergeant Richard Santos, was prohibited from attending the interview by Carter. At the time the interview was conducted, Detective Hornoff was the only suspect of the crime and no substantive investigation had been done beyond the crime scene. Carter concluded the interview in less than thirty minutes and there is no memorialization of what he asked Hornoff. There is no formal statement, no narrative statement, and no known summary report of what Hornoff said less than six hours after Ms. Cushman's body was found. As of today's date, it is unclear whether Hornoff was asked by Carter where he had been on the night of the murder.

It is very significant that Edward Johnson and Ronald Carter have drastically different recollections of what occurred during the interview of Detective Hornoff. Johnson recalls that the interview was not substantive, lasted less than fifteen minutes, and appeared to be primarily intended to induce Hornoff to submit to a polygraph examination. In addition, Johnson is certain that the interview was not taped and that there was not a tape recorder visible in the office where the interview occurred. Johnson recalls that Hornoff stated that Victoria Cushman's name sounded familiar, but that he denied that they were involved in a relationship.

Ronald Carter believes that the interview was much more substantive and that Detective Hornoff admitted his relationship with Ms. Cushman. In addition, Carter recalls Hornoff stating that he had attended a party at a Warwick patrolman's home the preceding evening. However, Carter cannot recall whether his interview of Hornoff was audiotaped. Carter states that he placed a tape recorder on the desk in the room in which the interview

was being conducted, but cannot recall turning on the tape recorder and does not remember listening to a recording of the interview after its conclusion. However, Carter believes that the interview may have been recorded and that the tape was given by him to then Lieutenant Johnson. Johnson is certain that there was not a tape recorder present at the interview and that he was never given a tape by Carter after the interview or at any other time. No tape of this interview is currently known to exist.

Both Captain Carter and then Lieutenant Johnson agree that Carter directed Johnson to prepare a report of the interview with Detective Hornoff. This report was completed, the rights form Hornoff had signed prior to the interview was attached, and the documents were handed to then Chief of Police Blanchard. Chief Blanchard reviewed Johnson's report and the rights form on August 15, 1989, and gave them to Carter. No one has seen Johnson's report of the Hornoff interview since that date. It is missing and Carter denies having received it from Chief Blanchard. However, Carter was in possession of the rights form which was attached to the report when it was submitted by Johnson and last seen by Chief Blanchard. Carter gave the rights form to Detective Raymond Pendergast for inclusion in the Cushman case file on the last day of his employment at the Warwick Police Department.

It is clear that the interview of Detective Hornoff concluded with Hornoff agreeing to undergo a polygraph examination by Sergeant Edmund Pierce. Captain Carter directed Pierce to perform the polygraph after he and Lieutenant Johnson briefed Pierce on the few facts that were known about the homicide at that time. Sergeant Pierce informed Carter that he should not conduct an examination on a member of his own department and that a member of an outside law enforcement agency should be called and the examination conducted at a later date. Pierce suggested that the Rhode Island State Police conduct the polygraph. Sgt. Richard Santos agreed and made the same suggestion. Both state that

they were told by Carter that he, Carter, was running the investigation. Carter then ordered Pierce to conduct the polygraph examination and ordered Santos to leave the station to speak with Hornoff's wife.

Sergeant Pierce, operating on a direct order, then conducted a polygraph examination that violated virtually every known rule of polygraphy. The American Association of Police Polygraphists publishes "Standards and Principles of Practice" to be adhered to by polygraphists in criminal investigations. These standards clearly state that a polyraph examination should be a supplement to, not a substitute for, a field investigation, and that the effectiveness of the polygraph examination is largely based on the thoroughness of the field investigation which precedes the administration of the examination. In addition, prior to conducting the examination the polygraphist should be provided with an opportunity to review the complete case file, familiarize himself with the case facts through interviews, learn about the background of the person to be examined, and learn as much as can possibly be known about the crime. In addition, these same standards clearly state that the polygraphist should have sole responsibility to determine if a particular examination should take place and should have the ability to select the time and location of the examination.

At the time Sergeant Pierce administered the polygraph examination to Detective Hornoff on August 11, 1989, he knew virtually nothing about the murder of Victoria Cushman. He did not know the cause or the manner or the approximate time of death; he had no opinion from the medical examiner regarding the weapon or instrumentality of death; he had no medical opinion as to whether a sexual assault had preceded death; he knew nothing about the victim; he had not visited the crime scene or viewed photographs of that scene; he did not know if there was evidence of more than one perpetrator; he did not know if there were any other suspects; he did not know if fingerprints or other

forensic evidence was recovered at the scene; he did not know if the subject of the polygraph examination had an alibi; and there were absolutely no written police reports, photographs, or case file for him to review.

The investigation into the death of Ms. Cushman was at its most preliminary stage at the time the polygraph examination of Detective Hornoff was administered. Sergeant Pierce, through no fault of his own, simply did not have sufficient information to know what questions to ask or what tests to run during his polygraph examination of Hornoff. Had the order to conduct the polygraph been delayed by even one day, Sergeant Pierce or, preferably a polygraphist from an outside agency, would have had access to the medical examiner's findings, been able to review reports from investigators and review interviews with friends and family members of the deceased, been able to view the crime scene and review photographs taken when the body was discovered at that crime scene, and been able to interview the detectives who were investigating the homicide. However, Sergeant Pierce was ordered by Captain Carter to perform the examination on the late afternoon of August 11th, and, consequently, the timing of the examination was wholly inconsistent with obtaining accurate and reliable polygraph results. At the conclusion of the examination, Pierce's charts indicated a lack of deception and Hornoff was informed that he had passed the polygraph. According to then Lieutenant Johnson, it was only after being advised of the polygraph results that Hornoff admitted to Johnson and Carter that he knew Victoria Cushman and that he had engaged in sexual relations with her.

Immediately after the polygraph was completed, Captain Carter told the assembled Warwick detectives that Hornoff was no longer a suspect, was not to be considered a suspect and that they were to focus their investigation elsewhere. This brings us to the third aspect of the police investigation on the day the murder investigation began. The decision to immediately and absolutely absolve Hornoff of any responsibility for the

killing based upon the faulty polygraph examination directly resulted in the failure of the Warwick Police Department to conduct a proper and competent investigation away from the crime scene on August 11, 1989.

It should be noted at this point that Captain Carter states that he was acting on direct orders from then Administrative Assistant to the Chief John Mulhearn when he ordered Pierce to conduct the polygraph examination of Detective Hornoff on the same day Ms. Cushman's body was discovered. Carter also states that the decision to absolve Hornoff from any responsibility for the crime based solely on the polygraph examination and to focus the investigation on a search for other suspects was also made by Mulhearn. Mulhearn adamantly denies that he gave Carter or anyone else those orders and maintains that Carter was making his own decisions as the captain in charge of the detective division. Sergeant Pierce, Sergeant Santos, and Lieutenant Johnson all state that Carter did not indicate that he was acting on the orders of a superior officer when issuing directives regarding the polygraph and Hornoff. Sergeants Pierce and Santos state that Carter made it clear that he was running the investigation when overruling their objections to the polygraph.

Regardless of which officer of the Warwick Police Department issued the order regarding the polygraph and subsequent exclusion of Detective Hornoff as a suspect, it is clear that at the conclusion of the polygraph at 7:21 P.M. on August 11, 1989, the Warwick Police had determined that Detective Hornoff was no longer to be investigated as a possible perpetrator of Victoria Cushman's homicide.

The directive that Detective Hornoff was to be excluded as a suspect in Ms. Cushman's homicide is significant because at the very time Detective Hornoff was being questioned and examined at police headquarters, Sergeant Santos was learning that

Hornoff had attended a party the night of the killing at the home of a fellow Warwick police officer. This party was attended by numerous other members of the Warwick Police Department. Santos learned that Hornoff left the party with his brother, Sergeant John David Hornoff, at approximately 11:30 P.M. to 12:00 A.M. on the night of August 10th. Detective Hornoff's wife told Santos that she was awakened by her husband making noise in the house at approximately midnight, she heard him leave the house, and she did not know what time he went to bed. Upon returning to headquarters with this information, Santos was told by Captain Carter that Detective Hornoff had passed a polygraph and was not to be investigated any further.

Consequently, the police officers who attended the party with Detective Hornoff were never questioned about their observations of him at the party. Approximately 17 months later, it was learned that Detective Hornoff had returned to the party at approximately 1:00 A.M., was sullen and acting in an atypical and repressed manner, and may have had a facial wound. The individuals who provided this information were either Warwick police officers, many of whom were reporting to work as Hornoff was being interviewed by Carter on the day of the homicide, or spouses of police officers. None of these individuals were spoken to on the day of the crime or in the following months when their recollections would have been strongest. Sergeant Hornoff was never interviewed by a member of the Warwick Police Department regarding his knowledge of his brother's whereabouts on the night of the killing.

In addition, the clothes Detective Hornoff was wearing on the preceding evening were not recovered for forensic evaluation and the automobile he drove was not processed for forensic evidence. The August 11th determination of Hornoff's lack of involvement based upon Carter's limited interview and the faulty polygraph prevented the value of this evidence from ever being assessed.

Finally, the decision to absolve Detective Hornoff's from responsibility less than nine hours after Ms. Cushman's body was found prevented the utilization of basic investigative steps such as the taking of Hornoff's fingerprints for comparison with those found at the crime scene. Hornoff's fingerprints were never compared with those found at the crime scene during the more than twenty-five months the investigation was run by the Warwick Police Department.

**The second aspect of the review of the police investigation of Ms. Cushman's death involves what occurred after Hornoff was dismissed as a suspect on August 11, 1989. This will be discussed by reviewing the actions of Ronald Carter, Joseph Duquette, and Wesley Blanchard during this time period.**

Captain Ronald Carter's role in the investigation of Victoria Cushman's death was limited due to his retirement approximately two months after declaring that Hornoff was not a suspect and was not to be investigated. It is noteworthy that Carter states that on August 11, 1989, he was aware that his retirement from the Warwick Police Department was imminent. However, some of Carter's actions during the intervening two months were significant for purposes of this review. First, Carter permitted Detective Hornoff to work on the Cushman murder and there is a report from Hornoff in the investigative file. In addition, the Major Crime Unit detective assigned by Sergeant Santos to assemble the Cushman investigative file, Raymond Pendergast, states that Carter refused repeated requests to turn over the rights form Hornoff had signed prior to being interviewed on August 11th. Carter also failed to advise Sergeant Santos, who was now in charge of the Cushman investigation subject to the authority and supervision of Carter, that Lieutenant Johnson had prepared a summary of the Hornoff interview. The effect of these actions

was that anyone looking at the investigative file would not know that Hornoff was ever interviewed as a suspect in connection with the murder of Victoria Cushman.

Again, it should be noted that Captain Carter denies receiving or refusing requests to turn over Detective Hornoff's August 11, 1989, rights form. Carter states that he was surprised to find the form when cleaning out his desk in the days immediately preceding his retirement. Carter states that the form was not attached to Lieutenant Johnson's summary of the Detective Hornoff interview and Carter does not recall if he ever saw that summary. Carter maintains that he handed the rights form to Sergeant Santos soon after discovering it in his desk and told Santos that it had been inadvertently misplaced. However, Detective Pendergast and others present recall Carter handing the rights form to Pendergast as he was leaving Warwick police headquarters on his last day of work. The event is memorable because of the expletive directed by Pendergast at the outgoing captain.

Joseph Duquette, then a captain, was appointed on October 21, 1989, to replace Carter as the captain in charge of the detective division. Many aspects of Duquette's conduct in connection with the Cushman investigation are significant. First, Duquette was a close personal friend of Sergeant John David Hornoff at the time of his appointment to Detective Captain. Duquette and Sergeant Hornoff socialized together and, after being made Detective Captain, Duquette gave Sergeant Hornoff a preferred assignment by putting him in charge of the detective division's Special Operations Group. Warwick's Special Operations Group is commonly referred to as the drug unit.

Captain Duquette's appointment of Sergeant Hornoff to head the drug unit is notable because it created a financial relationship between them at a time when Duquette was overseeing the investigation into Victoria Cushman's homicide. Sergeant Hornoff

headed this unit from August 19, 1990, until January 17, 1993. During this time period, the Special Operations Group was receiving funding from the Governor's Justice Commission and the money received from this commission was utilized solely by that unit. There was no accounting of these funds to the City of Warwick or to the City's budget for the police department. Funds received from the Commission were spent largely at the discretion of the head of the drug unit. Significantly, overtime work was delegated by the head of the unit and paid for with a separate check from a separate account funded by the Governor's Justice Commission.

When Sergeant John David Hornoff took over the narcotics unit, Captain Duquette began to work significant amounts of overtime in connection with that unit. This overtime was approved and paid by Sergeant Hornoff, a subordinate officer. Special Operations Group overtime records for Captain Duquette are only available from the time Sergeant Hornoff took command of the unit in mid-August, 1990, until late April, 1992. During this approximately twenty month period, Sergeant Hornoff approved and Captain Duquette received $7,430.53 in overtime payments from the drug unit's Governor's Justice Commission funds. This overtime is above and beyond Duquette's normal salary from the City of Warwick and any other overtime Duquette was receiving from the city's police department budget. It is also noteworthy that during this time period, Captain Duquette would approve Sergeant Hornoff's overtime from the same Special Operations Group's account.

The above-outlined financial relationship involving Captain Duquette and the brother of Detective Jeffrey Scott Hornoff is significant because as captain in charge of detectives, Duquette continually refused to permit Sergeant Santos and Major Crime Unit case detectives to re-interview Detective Hornoff about the Cushman murder. Duquette also refused to let Santos and these same detectives interview Sergeant John David

Hornoff regarding his brother's alibi. The detectives had exhausted all of their leads and their investigation continually led them back to Detective Hornoff. Santos and his detectives continually asked for permission to re-interview Hornoff and were repeatedly told that they should first re-interview other individuals whose names had surfaced during the investigation. Consequently, some of these others were interviewed three and four times each without Detective Hornoff being approached for a second time or his brother ever being interviewed by Santos and his detectives. On at least two occasions, Duquette gave permission to re-interview Detective Hornoff at a future date and would then cancel the interview as the day of the scheduled interview arrived. At one time, Duquette stated that Sergeant and Detective Hornoff could not be interviewed in November or December because that was the holiday season and Duquette did not want the case detectives to spoil the Hornoffs' holidays. Duquette also had Santos and his fellow detectives visit a psychic and a forensic psychologist as intermediate investigative steps.

It is imperative to note that there is no direct evidence that the financial relationship between Captain Duquette and Sergeant John David Hornoff affected Duquette's handling of the Cushman homicide investigation. The above described financial relationship is merely further evidence of the inappropriately close relationship between Captain Duquette, the member of the Warwick Police Department who was in overall command of the Cushman homicide investigation, and Sergeant Hornoff, the brother of the individual considered to be a suspect by the investigating detectives.

In October of 1991, the investigation of the Victoria Cushman murder was turned over to the Rhode Island State Police at the urging of the Department of Attorney General. As of that time, Duquette had been in charge of the case for more than 21 months and had denied numerous requests to re-interview Detective Hornoff and to interview David Hornoff. Duquette has stated that he concentrated on the forensic

aspects of the case during this time period. However, a review of the investigative file reveals that there were no forensic initiatives or developments during this time period.

Captain Duquette's conduct after the case had been given to the State Police is also significant. Duquette repeatedly told fellow members of the Warwick Police Department that the State Police were investigating the department and not the Cushman murder. At one time, he ordered all detectives to refrain from speaking to or cooperating with the State Police. This included ordering the two liaisons from the Warwick Police Department, Sergeant Santos and then Lieutenant Thomas Nye, to stop giving the State Police requested information and access to Warwick Police Department records. In addition, Duquette ordered that he be notified of all contact with the Warwick Police Department by the State Police and that all requests from the State Police for information be immediately directed to his attention.

At one point, the assigned State Police detectives requested that Captain Duquette make inquiry as to which members of the Warwick Police Department had attended the party at the police officer's home on the night of August 10, 1989. This is the same party that Detective Hornoff is believed to have attended and the purpose of the request was to speak with individuals who had seen him that night. Duquette refused to comply with this request stating that the State Police should tell him which members of the Warwick Police Department they had already spoken with and should also specify which members they intended to speak with in the future. The State Police refused this demand and asked Duquette for a roster of all non-civilian members of the Warwick Police Department as of August 10, 1989. Duquette also refused this request and did not provide this roster until directed to do so by the Assistant Attorney General conducting the Grand Jury inquiry into Ms. Cushman's homicide.

Subsequently, on May 7, 1993, Duquette prepared a memorandum for review by all members of the Major Crime Unit which prohibited them from speaking with any member of the Department of Attorney General or the Rhode Island State Police regarding the Cushman homicide unless they were subpoenaed to do so before a Grand Jury. The service of such a subpoena to any member of that unit was to be reported immediately to a superior officer. Duquette directed Sergeant William McDonald to have each Major Crime Unit detective read the memo in McDonald's presence and initial it in agreement. One detective refused to sign off on this memo stating that he believed it would be a crime to come into possession of relevant information and not voluntarily reveal that information to the Attorney General. Duquette personally confronted this detective about his refusal to sign and this detective subsequently initialed the agreement.

After the Rhode Island State Police assumed control of the Victoria Cushman homicide investigation, Captain Duquette is reported to have made numerous statements regarding the State Police handling of the matter. Duquette stated on more than one occasion that the investigation being conducted by the State Police was really an investigation of the Warwick Police Department's handling of the Cushman homicide and that the State Police were "going to make the department look bad". On one occasion, Duquette stated that he was going to prevent the case from ever going to a Grand Jury. On another occasion, Duquette stated that "E.J." (then Lieutenant, now Major Edward Johnson) had to be "protected at all costs". In connection with that last statement, Duquette said that because Captain Carter was retired, Edward Johnson would be blamed for how the case was handled. There is no indication that Major Johnson ever asked Duquette to act on his behalf or, for that matter, that Johnson had any culpability for following the orders of a superior officer on August 11, 1989.

The next aspect of this review involves the conduct of then Chief of Police Wesley Blanchard. Chief Blanchard was not working on the day of the Cushman murder. Thereafter, he appeared to rely nearly exclusively on Captain Carter and, later, Captain Duquette for information on the Cushman investigation.

There was an initial meeting regarding the case held in the chief's office on August 15, 1989. This is the meeting where Chief Blanchard was given the report prepared by then Lieutenant Johnson, with Detective Hornoff's rights form attached. The meeting was also attended by Carter, Johnson, Administrative Assistant to the Chief John Mulhearn, Commander Walter McKnight, and Commander John Glendinning. Some participants at the meeting state that Carter adamantly maintained that Detective Hornoff should not be investigated any further because he had passed the polygraph examination on August 11th. Commander McKnight stated that he believed that Detective Hornoff should be interviewed again regarding the killing. John Mulhearn recommended that an outside law enforcement agency take over the investigation. Mulhearn suggested the Federal Bureau of Investigation. It was reported by some participants that Carter reacted angrily to these suggestions and continued to insist that Detective Hornoff should not be investigated. Mulhearn states that he walked out of the meeting because of the way Carter was acting and because he was receiving no support from Chief Blanchard.

Chief Blanchard's and Captain Carter's recollections of the meeting differ from the above. Both maintain that Carter did not become angry when expressing his opinions. Carter states that everyone at the meeting was in agreement that Detective Hornoff should not be considered a suspect and that the investigation should proceed in a different direction. Chief Blanchard does not recall everything that was said at the meeting, but believes that everyone was in agreement by the end of the meeting that Detective Hornoff was not a suspect.

Regardless of what occurred at the meeting, the result is that Chief Blanchard followed Carter's recommendation and Detective Hornoff was dismissed as a suspect in Victoria Cushman's death. When Captain Duquette succeeded Carter as Detective Commander, Chief Blanchard relied on Duquette for briefings on the investigation. Sergeant Santos and the investigating Major Crime Unit detectives had to rely on Duquette to make their investigative requests known to Chief Blanchard. As a result, Detective Hornoff and his brother, Sergeant Hornoff, were not interviewed by anyone investigating Ms. Cushman's death until the case was turned over to the State Police.

There are two other significant aspects to that August 15th meeting in Chief Blanchard's office. All of the participants, except Chief Blanchard and Captain Carter, recall a lengthy discussion regarding where the Cushman investigative file should be kept to prohibit the media from learning that Hornoff had been interviewed as a suspect. According to the others, more time was spent discussing this topic then was spent discussing Detective Hornoff's status as a murder suspect.

The second notable aspect of that meeting is that sometime thereafter the decision was made to intentionally prevent Commander McKnight and Administrative Assistant to the Chief Mulhearn from learning any additional information about the Cushman investigation. Subordinates involved in the investigation were told that they were not to discuss the investigation with either of these two individuals.

**The final aspect of this section of the review involves the safekeeping of documents relating to the investigation.**

It is clear that Lieutenant Johnson prepared a written report outlining the August 11, 1989, interview of Detective Hornoff by Captain Carter. This document had the rights form attached and was given by Johnson to Chief Blanchard in a timely manner. This report was never returned to Johnson. Chief Blanchard believes that he gave the document to Carter. Carter denies ever seeing the document, but admits being in possession of the rights form which was attached to this report. No one has seen this document since August 15, 1989, and it is the only memorialization of an interview conducted significantly less than twenty-four hours after a murder of the person who is now under indictment for that murder.

In addition, there are other documents related to this investigation which cannot be located. The Warwick Police Department maintains C.A.D. (Computer Aided Dispatch) printouts in chronological order. These documents are computer generated and display, amongst other things, incoming calls to the Warwick Police Department and the police units dispatched to those calls. The C.A.D. printouts from 7:45 A.M. on August 10, 1989, until 8:11 A.M. on August 11, 1989, are missing and apparently have been removed from their binder. This was discovered by the State Police during their investigation when they were gathering information regarding the party at the patrolman's house on the night of August 10, 1989. No other C.A.D. printouts in the weeks and months surrounding the above date are missing.

Finally, on May 25, 1994, Lieutenant Beth Ellinwood discovered some original documents from the Warwick Police Department's Cushman homicide investigation file in a box with other documents which were designated to be shredded. Lieutenant Ellinwood retrieved these documents prior to their being destroyed and gave them to her superiors. It is unknown how those documents were placed in a box of documents which were to be discarded.

## Conclusions and Recommendations

First, it is extraordinarily important to note that the vast majority of the members of the Warwick Police Department who worked on or became involved in the investigation of Victoria Cushman's death did so with dedication, objectivity, and resolve. Ms. Cushman's father, Robinson Cushman, recalls going to Warwick Police headquarters on several occasions to speak with Sergeant Richard Santos for the purpose of obtaining an update on the progress of the investigation. Mr. Cushman recalls seeing his daughter's photograph pinned to the wall near Sergeant Santos' desk and accepting this as a symbol that Sergeant Santos and those working for him had not lost their determination to find his daughter's killer. It was the rank and file investigative detectives of the Major Crime Unit, Sergeant Santos, and, later, Lieutenant Thomas Nye, who kept the pressure on Duquette and, eventually, obtained a meeting with Chief Blanchard. At this meeting they were able to give their perspective directly to the Chief of Police and obtained his permission to bring the matter to the Department of Attorney General. The investigation was referred to the Rhode Island State Police within one week of Santos and Nye meeting with an Assistant Attorney General.

Unfortunately, that meeting took place in late September of 1991, and many investigative opportunities were irretrievably lost at that point. As noted, Detective Jeffrey Scott Hornoff's clothes and automobile are no longer available for forensic evaluation. The ability to interview the individuals who attended the patrolman's party on the evening of August 10, 1989, when the events of that evening were most recent is also gone. It cannot be overstated that many of the people at that party were police officers who were reporting for work while Carter was interviewing Detective Hornoff on the

afternoon of August 11th. These officers would be crucial in either implicating or clearing Detective Hornoff and they were not spoken to even though they were under the direct control of the Warwick Police Department. In addition, it is inexplicable that Sergeant John David Hornoff was not spoken to regarding his knowledge of his brother's whereabouts on the night of August 10th in the more than two years that the Warwick Police Department had exclusive control of the investigation.

Responsibility for these failures lies with former Chief of Police Wesley Blanchard and the individuals he placed in positions of authority. Chief Blanchard bears responsibility because as the Chief of Police he was in charge and was accountable for what occurred under his command. Chief Blanchard states very candidly that he is not an experienced investigator and that he has never represented himself to be an experienced investigator. Chief Blanchard says that he relied upon the investigative experience and judgment of his Detective Captain(s) in making decisions regarding the Cushman homicide investigation. Chief Blanchard adds that he had no reason for believing that the factual reports and analysis being given to him by the Detective Captain(s) was not well reasoned or objective.

In assessing Chief Blanchard's statements it is important to note that when Sergeant Santos and Lieutenant Nye were able to speak with the Chief directly, they were not prohibited from bringing the matter to the Attorney General. In addition, Chief Blanchard did not object to immediately following the recommendation of the Attorney General that the Rhode Island State Police become involved in the investigation. However, there are two other factors which must be considered. First, a Chief of Police with a more aggressive management style would have become aware at a much earlier point in time that the rank and file investigators strongly disagreed with the positions being presented by the Detective Captain. Second, it is evident that at the August 15, 1989,

meeting in the Chief's office concerns were expressed regarding the public becoming aware that a member of the Warwick Police Department had been interviewed as a suspect in Ms. Cushman's murder and actions were taken to hide this fact from the public.

The actions of former Captain Carter and Major Duquette are much more difficult to defend, and the motives for those actions much more difficult to discern. Carter states that he was acting on the orders of a superior officer on August 11, 1989, and it is not the purpose of this review to resolve the conflicting recollections as to who was making decisions on that date. However, it is clear that Carter treated Detective Hornoff like a police officer and not like a suspect in a homicide when Carter interviewed Detective Hornoff. It is also clear that Carter assumed control of a major investigation that he had no ability nor intention of retaining. Of greater importance, he deliberately excluded Sergeant Santos, the person who he knew would ultimately be responsible for solving the murder, from the interview of Hornoff. Finally, Carter failed to ensure that his interview with Detective Hornoff was properly memorialized. Carter's actions involved the interview of a police officer who at the time was a suspect in a murder investigation. His current statements that the interview may or may not have been audiotaped and that he does not recall seeing Lieutenant Johnson's report of the interview, while being unable to explain his possession of the rights form attached to that report, demonstrates an absolute failure to meet his responsibilities in this area.

Major Duquette's refusal to permit the detectives who were trying to find Victoria Cushman's murderer to re-interview Detective Hornoff and to conduct an initial interview of his brother, Sergeant John David Hornoff, is beyond explanation. Duquette's statement that for the nearly two years that he had the case he was concentrating on forensics is belied by the facts. Based on all available evidence it appears that, at a minimum, Duquette subrogated his obligation to fully investigate the murder of a young woman to

protect the Warwick Police Department or specific members of the Warwick Police Department from what he viewed as unjust criticism or scrutiny. Unfortunately, it is not possible to make a statement beyond the above without speaking with Major Duquette personally. As noted in the introduction, Major Duquette is and has been unavailable to be interviewed regarding his actions in this matter.

However, it is possible to make recommendations regarding changes which could be implemented to prevent the Warwick Police Department from repeating the mistakes made during its investigation of Victoria Cushman's homicide. The major issue involves whether this type of matter should be investigated by members of a suspect's own police department. There is no easy rule of thumb because in the past police departments in this state have successfully criminally investigated and subsequently charged members of their own department. These police departments have usually preliminarily informed the Department of Attorney General of their decision to retain the investigation and have consulted with the Attorney General throughout that investigation.

The Warwick Police Department should create a policy of immediately notifying and regularly consulting with the Attorney General if they make a future determination to retain control of a criminal investigation of one of their own members. In addition, there has to be a determination made that if they are going to keep such an investigation, then the member of their department under suspicion has to be treated like a suspect and not like a police officer. This treatment has to be comprehensive and should include everything from what questions they are asked in an interview to what happens to the reports and documents which result from that interview. If the decision is made to request the assistance of an outside law enforcement agency, then a concurrent decision must be made to fully cooperate with that agency. Finally, regardless of which decision is made, the Chief of Police must personally monitor what is occurring and ensure that the above

procedures and commitments are being followed. The reputation and integrity of too many dedicated and hard working members of the Warwick Police Department are at stake for this responsibility to be delegated to a subordinate.

________________________________

Kevin J. Bristow, Esq.